UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

—————————————————————————————
                                    )
HOPKINTON DRUG, INC.                )
                                    )
            Plaintiff,              )
                                    )
            v.                      )          CIVIL ACTION
                                    )          NO. 14-12794-WGY
CAREMARKPCS, L.L.C.                 )
CVS CAREMARK, Corp.                 )
                                    )
            Defendants.             )
—————————————————————————————       )

MEMORANDUM

YOUNG, D.J.                                    January 5, 2015

## I.    INTRODUCTION

        In this emergency action, CaremarkPCS, L.L.C. and CVS

Caremark Corporation (collectively, "Defendants" or "CVS

Caremark"), moved to compel the plaintiff, Hopkinton Drug, Inc.

("Hopkinton") to submit to arbitration most of the claims

asserted in its complaint, and to stay any remaining claims.

Hopkinton, in reply, argued that the arbitration agreement is

invalid and, even if it is valid, does not cover the actions at

issue in this lawsuit.

        The relationship between the parties is governed by a broad

arbitration clause which compels arbitration. This Court does,

however, retain the authority to issue a preliminary injunction

and may develop the factual record necessary to do so.  Before

doing so, however, it needed to assure itself that the conduct Hopkinton originally sought to enjoin has not yet occurred; if it has, a preliminary injunction would be moot and could not be issued.

**A.  Procedural History**

On June 30, 2014, Hopkinton filed a five-count complaint against the Defendants, in which it sought injunctive and monetary relief.  Verified Compl. & Jury Demand, ECF No. 8.  On that same day, it also filed an emergency motion for a temporary restraining order ("TRO").  Emergency Mot. TRO, ECF No. 3.  This Court held a hearing two days later, on July 2, 2014, at which time, as is its wont, it combined the TRO motion with a trial on the merits pursuant to Federal Rule of Civil Procedure 65(b), and placed the case on the running trial list for September 2014.  The next day, on July 3, Hopkinton filed an amended complaint, which added an additional count seeking confirmation of a previously issued arbitration award entered in its favor and against the Defendants.  Verified Am. Compl. & Jury Demand ("Compl."), ECF No. 12.

That same day, the Defendants filed a motion to compel arbitration, along with an accompanying memorandum.  Defs.' Mot. Compel Arbitration, ECF No. 13; Mem. Law Supp. Defs.' Mot. Compel Arbitration ("Defs. Mem."), ECF No. 14.  Hopkinton responded on July 10, 2014.  Pl.'s Mem. Law Opp'n Defs.' Mot.

Compel Arbitration ("Pl.'s Opp'n"), ECF No. 16.  The Defendants

replied on July 14, 2014.  Reply Supp. Defs.' Mot. Compel,

Arbitration ("Defs.' Reply"), ECF No. 23.

The Court heard the matter on an expedited basis on July 17

and 18, 2014. Elec. Notice, July 14, 2014, ECF No. 21.

### B. Concerning Arbitration[1]

Hopkinton is an independent pharmacy, which specializes in

compounded pharmaceuticals (i.e., "preparing on a prescription-

by-perception basis compounded medications for patients who

cannot take standard prescriptions."). Compl. ¶¶ 7-8.  CVS

Caremark is a national pharmacy operator. Caremark entered into

a provider agreement (the "Provider Agreement") with Hopkinton

whereby Hopkinton agreed to fill prescriptions for health care

plan members for which CVS served as a pharmacy benefits manager

("PBM").[2]  Id. ¶ 13.  On June 23, 2014, CVS Caremark issued a

---

[1] Where undisputed, the following conclusions are drawn from
Hopkinton's Amended Complaint, supplemented where appropriate by
documents that are attached to the motion to compel arbitration
and are central to the parties' claims.  See, e.g., Gove v.
Career Sys. Dev. Corp., 689 F.3d 1, 2 (1st Cir. 2012)
(considering documents attached to motion to compel
arbitration); cf. also, e.g., Graf v. Hospitality Mut. Ins. Co.,
No. 13-2167, 2014 WL 2599681, at *1 (1st Cir. June 11, 2014)
(noting that a court may consider necessary documents attached
to a motion to dismiss). The Court resolved the disputed facts
after a two-day evidentiary hearing culminating on July 18,
2014.

[2] "PBMs process and pay pharmacies, such as the Plaintiffs,
for filling prescriptions for patients and consumers insured
under health-insurance plans that the PBMs manage." Crawford

3

written notice to Hopkinton, alleging that Hopkinton was not in compliance with the Provider Agreement, and that it would terminate Hopkinton's rights under the agreement. <u>Id.</u> ¶¶ 16, 19.

The relationship between Hopkinton and CVS is governed, as discussed above, by the Provider Agreement, which incorporates by reference a provider manual (the "Provider Manual"). The Provider Manual sets out further details governing the contractual obligations among the parties. <u>See</u> Defs.' Mem, Ex. 6, Decl. Wendy Walker, Ex. C, Provider Agreement, ECF No. 14-6. The parties first entered into the Provider Agreement in 1995, and it governs the contractual relationship today. <u>See</u> Defs.' Mem, Ex. 6, Decl. Wendy Walker 2. The Provider Agreement includes a clause requiring all disputes to be settled by an arbitrator, Provider Agreement § 9.5, as well as a provision allowing Caremark to amend the agreement or manual "by giving notice to the Provider of the terms of the amendment and specifying the date the amendment becomes effective." <u>Id.</u> § 1.3. By agreement, Arizona law applies to any substantive disputes. <u>Id.</u> § 9.4.

The Provider Manual also includes an arbitration clause. Complicating the dispute, there are two Manuals at issue here:

---

<u>Prof. Drugs, Inc.</u> v. <u>CVS Caremark Corp.</u>, 748 F.3d 249, 254 n.1 (5th Cir. 2014).

one issued in 2011 (the "2011 Manual"), and one issued in 2014

(the "2014 Manual").

As is relevant for arbitration purposes, the 2011 Agreement

provides that:

> Any and all disputes in connection with or arising out
> of the Provider Agreement by the parties will be
> exclusively settled by arbitration before a single
> arbitrator in accordance with the Rules of the
> American Arbitration Association.  The arbitrator must
> follow the rule of Law, and may only award remedies
> provided for in the Provider Agreement.  The award of
> the arbitrator will be final and binding on the
> parties, and judgment upon such award may be entered
> in any court having jurisdiction thereof.  Any such
> arbitration must be conducted in Scottsdale, Arizona,
> and Provider agrees to such a jurisdiction, unless
> otherwise agreed to by the parties in writing.  The
> expenses of arbitration, including reasonable
> attorney's fees, will be paid for by the party against
> whom the award of the arbitrator is rendered.  Except
> as may be required by Law, neither a party nor an
> arbitrator may disclose the existence, content or
> results of any dispute or arbitration hereunder
> without the prior written consent of both parties.
> Arbitration shall be the exclusive and final remedy
> for any dispute between the parties in connection with
> or arising out of the Provider agreement; provided,
> however, that nothing in this provision shall prevent
> either party from seeking injunctive relief for breach
> of this Provider Agreement in any state or federal
> court of law.

Pls.' Opp'n, Ex. 1, 2011 Provider Manual, ECF No. 16-1.

The manual further provides that the contract is not

static, but rather:

> From time to time . . . Caremark may amend the
> Provider Agreement . . . by giving notice to the
> Provider of the terms of the amendment and specifying
> the date the amendment becomes effective.  If Provider
> submits claims to Caremark after the effective date of

any notice or amendment, the terms of the notice or
amendment is accepted by Provider and is considered
part of the Provider Agreement.

Id. Pursuant to that authority, on November 15, 2013, CVS sent

Hopkinton a cover letter accompanied by a new Provider Manual

which "supersedes all previous versions of the Provider Manual"

as of January 1, 2014. Defs.' Mem, Ex. 6, Decl. Wendy Walker,

Ex. A, Caremark Letter, ECF No. 14-6. Wendy Walker,

CaremarkPCS's Director of Contracting Communications, averred

that Hopkinton Drug submitted claims after January 1, 2014, the

effective date of the 2014 Provider Manual. Defs.' Mem, Ex. 6,

Decl. Wendy Walker 3.

In turn, the 2014 Manual provides that:

Any and all disputes between Provider and Caremark
(including Caremark's employees, parents,
subsidiaries, affiliates, agents and assigns
(collectively referred to in this Arbitration section
as "Caremark"), including but not limited to disputes
in connection with, arising out of, or relating in any
way to, the Provider Agreement or to Provider's
participation in one or more Caremark networks or
exclusion from any Caremark networks, will be
exclusively settled by arbitration. Unless otherwise
agreed to in writing by the parties, the arbitration
shall be administered by the American Arbitration
Association ("AAA") pursuant to the then applicable
AAA Commercial Arbitration Rules and Mediation
Procedures (available from the AAA). In no event may
the arbitrator(s) award indirect, consequential, or
special damages of any nature (even if informed of
their possibility), lost profits or savings, punitive
damages, injury to reputation, or loss of customers or
business, except as required by law. The
arbitrator(s) shall have exclusive authority to
resolve any dispute relating to the interpretation
applicability, enforceability or formation of the

agreement to arbitrate, including, but not limited to any claim that all or part of the agreement to arbitrate is void or voidable for any reason. The arbitrator(s) must follow the rule of Law, and the award of the arbitrator(s) will be final and binding on the parties, and judgment upon such award may be entered in any court having jurisdiction thereof. Any such arbitration must be conducted in Scottsdale, Arizona and Provider agrees to such jurisdiction, unless otherwise agreed to by the parties in writing. The expenses of arbitration, including reasonable attorney's fees, will be paid for by the party against whom the award of the arbitrator(s) is rendered, except as otherwise required by Law.

Arbitration with respect to a dispute is binding and neither Provider nor Caremark will have the right to litigate that dispute through a court. In arbitration, Provider and Caremark will not have the rights that are provided in court, including the right to a trial by judge or jury. In addition, the right to discovery and the right to appeal are limited or eliminated by arbitration. All of these rights are waived and disputes must be resolved through arbitration.

No dispute between Provider and Caremark may be pursued or resolved as part of a class action, private attorney general or other representative action or proceeding (hereafter all included in the term "Class Action"). All disputes are subject to arbitration on an individual basis, not on a class or representative basis, and the arbitrator(s) will not resolve Class Action disputes and will not consolidate arbitration proceedings. Provider and Caremark agree that each may pursue or resolve a dispute against the other only in its individual capacity, and not as a plaintiff or class member in any purported Class Action.

Except as required by Law, neither a party nor an arbitrator may disclose the existence, content or results of any dispute or arbitration hereunder without the prior written consent of both parties. The above notwithstanding, nothing in this provision shall prevent either party from seeking preliminary injunctive relief to halt or prevent a breach of this

> Provider Agreement in any state or federal court of
> law.

Defs.' Mem, Ex. 6, Decl. Wendy Walker, Ex. A, 2014 Caremark
Provider Manual at 45-46, ECF No. 14-6 (emphasis supplied).

## II. ANALYSIS

### A. Arbitration?

This Court must address four distinct issues concerning arbitration: (1) which arbitration agreement applies to this case, the 2011 or 2014 Manual, (2) if the 2014 Manual applies, is it enforceable, or is it unconscionable, (3) if the 2014 Manual is enforceable, are questions regarding the scope of arbitrability to be made by the arbiter or this Court, and (4) if this Court does have a role to play in this agreement, is it limited to issuing a preliminary injunction?

#### 1. Federal Arbitration Act Context

This case implicates the Federal Arbitration Act ("FAA"), the "overarching purpose" of which is to "ensure the enforcement of arbitration agreements according to their terms so as to facilitate streamlined proceedings." AT & T Mobility LLC, v. Concepcion, 131 S. Ct. 1740, 1748 (2011). The FAA "embodies the national policy favoring arbitration." Buckeye Check Cashing, Inc. v. Cardegna, 546 U.S. 440, 443 (2006). Accordingly, in determining the scope of arbitration clauses, courts must consider general contract principles to determine the intent of

the parties which underlie those clauses, but "'ambiguities as to the scope of the arbitration clause itself [must be] resolved in favor of arbitration.'"  Dialysis Access Ctr., LLC v. RMS Lifeline, Inc., 638 F.3d 367, 376 (1st Cir. 2011) (quoting Mastrobuono v. Shearson Lehman Hutton, Inc., 514 U.S. 52, 62 (1995)).  In making this determination, the Court must first determine, as a threshold matter, that the arbitration agreement is valid, legally enforceable, and encompasses the dispute in question.  Id.

### 2. Which Arbitration Agreement Governs?

Both parties appear to agree that either the 2011 or 2014 Provider Manual sets out the arbitration clause that governs this action.  Compare Pl.'s Opp'n 6 (2011 Provider Manual applies), with Defs.' Mem. 2 (2014 Provider Manual applies). They disagree, though, as to which one applies.

Hopkinton argues that the 2011 Manual ought apply because the Defendants are estopped from relying on the 2014 Manual. Hopkinton points to the fact that "[d]uring [earlier] arbitration proceedings between CVS Caremark and Hopkinton Drug, CVS Caremark took the position that the 2011 Provider Manual was the operative document."  Pl.'s Opp'n 6.  Thus, Hopkinton argues, the Defendants waived the right to rely on the 2014 agreement in this action.  Id. at 7 (citing American Cont'l Life Ins. Co. v. Ranier Const. Co., Inc., 125 Ariz. 53, 55 (1980)

("Waiver is either the express, voluntary, intentional
relinquishment of a known right or such conduct as warrants an
inference of such intentional relinquishment.")). The
Defendants, in turn, posit that the original proceeding upon
which Hopkinton relies for its waiver argument was filed in
October 2013, and at issue in that proceeding was a CVS audit
which occurred in April 2013. Defs.' Reply 2. Such conduct,
they argue, occurred while the 2011 agreement governed. The
current suit, however, concerns a complaint filed on June 30,
2014, and at issue here is a 2014 decision by CVS to terminate
its contractual relationship with Hopkinton. Id. Accordingly,
they say, because the 2011 Manual governed conduct that happened
before 2014, and the 2014 Manual governed conduct that occurred
in 2014, there is no conflict, and thus no waiver or estoppel.

The Defendants have the better of this argument. First,
they are correct that the original arbitration (which both
parties agree was governed by the 2011 Manual) covered conduct
that occurred in April 2013. See Pl.'s Opp'n, Ex. 3,
CaremarkPCS, L.L.C.'s Mot. Dismiss Demand Arbitration 4, ECF No.
16-3. In the current suit, however, the gravamen of Hopkinton's
complaint is that the Defendants have breached their contractual
and other obligations by virtue of their decision to "issue[]

the Notice to Hopkinton Drug without proper cause."[3]  Compl. ¶

26.  That notice occurred in June 2014, when the 2014 Manual was

in effect.  Thus, it is consistent for the Defendants to argue

that one agreement governs one set of conduct, and another

agreement governs another set of conduct, even if those disputes

are between the same parties.  As "[w]aiver by conduct must be

established by evidence of acts inconsistent with an intent to

assert the right," American Cont. Life Ins. Co., 125 Ariz. at

55, and as there is no such inconsistency here, the Court

rejects Hopkinton's waiver argument.[4]

This ruling, however, does not necessarily resolve the

question.  There is an argument – which the parties have not

briefed and therefore may have waived – that Caremark did not

properly amend the 2011 Manual.  Under the terms of the Provider

---

[3] Count I (breach of contract), Count II (breach of covenant
of good faith and fair dealing), and  Count III (breach of Any
Willing Provider Act) are all based on the Defendants' decision
to terminate the Agreement.  Count IV (unlawful civil
conspiracy) does not have a clear date of injury, and Count V
(unfair and deceptive practices under Chapter 93A) is a
derivative claim of the first four counts.  Count VI, requesting
arbitration confirmation, is an essentially independent action.

[4] While Hopkinton uses the language "estoppel" in its
header, it primarily relies on cases that discuss waiver.  Pls.'
Opp'n 6-7.  In any event, an argument based on estoppel fares no
better.  Under Arizona law, "[e]quitable estoppel applies where
the party to be estopped engages in acts inconsistent with a
position it later adopts and the other party justifiably relies
on those acts, resulting in injury." Verma v. Stuhr, 223 Ariz.
144, 155 (Ariz. Ct. App. 2009).  As discussed above, in this
case, the Defendants have not taken any inconsistent action, nor
is there any evidence of reliance.

Agreement, Caremark may amend the agreement or manual "by giving notice to the Provider of the terms of the amendment and specifying the date the amendment becomes effective." Provider Agreement § 1.3. The 2011 Manual has similar language. 2011 Manual ("Caremark may amend the Provider Agreement . . . by giving notice to the Provider of the terms of the amendment and specifying the date the amendment becomes effective.").

Caremark provided Hopkinton 45 days' notice of the substitution of the 2014 Provider Manual, which satisfies the 30-day notice requirement set out in the Provider Agreement. See Provider Agreement § 1.3; Caremark Letter. It is not entirely clear, however, whether it gave "notice to the Provider of the terms of the Amendment." In its November letter, Caremark stated that:

> The Provider Manual is part of your Provider Agreement with CVS Caremark and this 2014 version supersedes all previous versions of the Provider Manual.

The question, which neither party raises in their briefs, is whether stating that the updated version "supersedes all previous versions" of the manual counts as giving notice of the terms of the amendment. By one reading, it does not, as "notice of the terms of the Amendment" would imply mentioning the specific terms that change between versions of the manual. By another reading, however, it would -- "provide notice of the terms of the Amendment" could be read simply as "what changed?"

12

and here, Caremark is essentially saying "the entire Manual has changed," or, said a different way, the terms of the Amendment are that the Manual is superseded-in-full.

Further complicating matters is the fact that, apparently, the Provider Agreement is updated relatively often (or at least changed several times in the first half of this decade). In the context of such repeated contractual processes, information on the course of performance and subsequent conduct of the parties is particularly useful. See, e.g., Darner Motor Sales, Inc. v. Univ. Underwrites Ins. Co., 140 Ariz. 383, 393 (1984); Evers v. Safety-Kleen Sys., Inc., No. CV 10-02556-PHX-NVM, 2012 WL 2871113, at *2 (D. Ariz. July 12, 2012). If the type of notice that CVS provided in its November 2013 letter was accepted, repeatedly, without objection, that would be evidence that the notice was sufficiently detailed to satisfy the Performance Agreement. If, however, the November 2013 letter was an aberration, it would be evidence that such notice would be insufficient. In that case, the operative agreement would be the most-recent agreement, which could be the 2011 Manual (had it been noticed properly) or even the original Performance Agreement.

The parties do not brief this issue, and thus this Court may properly consider it waived. See, e.g., Zoegenix, Inc. v. Patrick, No. 14-11689, 2014 WL 3339610, at *5 n.4 (D. Mass. July

8, 2014) (Zobel, J.) (unbriefed arguments are waived).
Moreover, if the 2014 Manual does not apply (because of a notice
failure) it is unclear what agreement does control, and the
Court likely cannot answer that question without further
information from the parties.

Accordingly, based on the issues the parties have
highlighted in their briefing, and the conclusions drawn
therefrom, this memorandum proceeds under the assumption that
the 2014 Manual applies.

### 3.    Unconscionability

Hopkinton argues that even if the 2014 Manual applies, the
arbitration clause itself ought be severed as unconscionable,
because it is a contract of adhesion that is unduly oppressive.
Pl.'s Opp'n 7-9.

Arizona law distinguishes between two types of contractual
unconscionability – "'procedural unconscionability, i.e.,
something wrong in the bargaining process, and substantive
unconscionability, i.e., the contract terms per se.'" Nelson v.
Rice, 198 Ariz. 563, 567 (Ariz. Ct. App. 2000) (quoting Phoenix
Baptist Hosp. & Med. Ctr., Inc. v. Aiken, 179 Ariz. 289, 293
(Ariz. Ct. App. 1994)).  Contractual unconscionability is
determined by the court as matter of law.  Maxwell v. Fidelity
Fin. Servs., Inc., 184 Ariz. 82, 87 (1995) (en banc).  Moreover,
at least for the sale of goods under the Uniform Commercial Code

(and thus presumptively for all contracts, barring case law to the contrary), a showing of substantive unconscionability alone is sufficient for an unconscionability holding.  See id. at 90.

### a.  **Procedural Unconscionability**

Procedural unconscionability "is concerned with 'unfair surprise, fine print clauses, mistakes or ignorance of important facts or other things that mean bargaining did not proceed as it should.'"  Id. at 88-89 (quoting Dan B. Dobbs, 2 Law of Remedies 706 (2d ed. 1993)).  Courts consider such factors as "'the real and voluntary meeting of the minds of the contracting party: age, education, intelligence, business acumen and experience, relative bargaining power, who drafted the contract, whether the terms were explained to the weaker party, whether alterations in the printed terms were possible, whether there were alternative sources of supply for the goods in question.'"  Id. at 89 (quoting Johnson v. Mobil Oil Corp., 415 F. Supp. 264, 268 (E.D. Mich. 1976)).  Hopkinton's primary argument is that the arbitration clause is unconscionable because CVS Caremark presented it to Hopkinton on an improper "take-it-or-leave-it basis."  Pl.'s Opp'n 10.

Under Arizona law, not all "take it or leave it" contracts are unconscionable, even if they are adhesive.  Broemmer v. Abortion Servs. of Phoenix, Ltd., 173 Ariz. 148, 1501 (1992) (en banc).  The situations where such contracts are found to be

15

procedurally unconscionable are generally those where there are
significant gaps in age, education, or income (such as in
consumer contracts). Mere differences in bargaining power, even
if significant, generally are not enough. E.g., Cooper v. QC
Fin. Servs., Inc., 503 F. Supp. 2d. 1266, 1278 (D. Ariz. 2007);
see also Equal Employment Opportunity Comm'n v. Cheesecake
Factory, Inc., No. 08-cv-1207, 2009 WL 1259359, at *3 (D.
Arizona May 6, 2009) ("Mere inequality in bargaining power is
not sufficient to invalidate an arbitration agreement.").
Accordingly, courts have generally been reluctant to find
contracts between merchants to be unconscionable. See Captain
Bounce, Inc. v. Bus. Fin. Servs., Inc., No. 11-CV-858 JLS (WMC),
2012 WL 928412, at *7 (S.D. Cal. Mar. 19, 2012). As such,
plaintiffs seeking a procedural unconscionability severance must
make (not merely allege) "a showing of the lack of meaningful
choice." Coup v. Scottsdale Plaza Resort, LLC, 823 F. Supp. 2d
931, 949 (D. Ariz. 2011).

Here, Hopkinton alleges that "[e]very retail pharmacy must
do business with CVS Caremark, since it is the largest provider
of prescription and related health services in the country.
There is no meaningful choice." Pl.'s Opp'n 10. It offered no
evidence of such a claim, however, as it was required to do.
Moreover, even if CVS is, indeed, the largest pharmacy provider,
that claim does not necessitate a conclusion that there is no

meaningful choice.  See, e.g., Captain Bounce, 2012 WL 928412,
at *7 (holding that there are meaningful choices so long as
there "exist[s] . . . reasonable market alternatives").  As
such, this Court concludes that there is an insufficient showing
of procedural unconscionability.

Such a conclusion accords with how other courts, applying
Arizona law to the Caremark contract (albeit the 2011 version)
have ruled.  In Crawford Prof'l Drugs, Inc. v. CVS Caremark
Corp., 748 F.3d 249 (5th Cir. 2014), the Fifth Circuit rejected
a procedural unconscionability claim on the grounds that there
was no evidence that the plaintiffs could not have abstained
from contracting with CVS (and in that case, there were
affidavits stating that Caremark is the largest PBM in
Mississippi, evidence lacking in the instant case), and that the
adhesion term was sufficiently conspicuous in the agreement.
Id. at 264-66.  Such grounds apply equally here.  Similarly, in
Uptown Drug Co., Inc. v. CVS Caremark Corp., 962 F. Supp. 2d
1172 (N.D. Cal. 2013), the court similarly rejected a procedural
unconscionability argument on three grounds: First, that the
plaintiff's allegations of a lack of bargaining choice were
"conclusory and unsupported by the evidence."  Id. at 1181.
Second, that the arbitration clause was sufficiently visible in
the manual.  Id. at 1182.  Third, the court concluded that in
the case of agreements between two business entities, the

17

plaintiff must provide evidence to show that it "was in any way unsophisticated" and that Caremark "had overwhelming relative bargaining power." Id. The reasoning of these courts, which address the same legal issues and the same facts as at issue here, are persuasive, and counsel in favor of a ruling that there is no procedural unconscionability in the contract at bar.

### b. Substantive Unconscionability

A contract may also be substantively unconscionable. In making that determination, the Court must look to the "actual terms of the contract and examine[] the relative fairness of the obligations assumed." Maxwell, 184 Ariz. at 89. Relevant factors include: "contract terms so one-sided as to oppress or unfairly surprise an innocent party, an overall imbalance in the obligations and rights imposed by the bargain, and significant cost-price disparity." Id. The plaintiff has the obligation of creating an evidentiary record to demonstrate that enforcement of a contract would be unconscionable. Harrington v. Pulte Home Corp., 211 Ariz. 241, 253 (Ariz. Ct. App. 2005).

Hopkinton premises its substantive unconscionability claim on three bases: first, that the arbitration clause limits Caremark's liability to actual damages, rather than punitive or indirect damages, lost profits, or reputational injury; second, that the agreement eliminated class actions as a permissible procedural vehicle, and third, that limiting judicial injunctive

18

relief only to preliminary injunctions is unfair.  Pl.'s Opp'n
12.

Turning first to remedies, Hopkinton correctly cites cases
holding that arbitration clauses that limit recovery to actual
damages can be substantively unconscionable.  See id. at 13
(citing, e.g., Whitney v. Alltel Comm'ns, Inc., 173 S.W.3d 300,
310 (Mo. Ct. App. 2005)); Bellsouth Mobility LLC v. Christopher,
819 So. 2d 171, 173 (Fla. 4th DCA 2002).  The Defendants, in
turn, rely on PacifiCare Health Sys. v. Book, 538 U.S. 401
(2003) for the proposition that arbitration clauses that limit
available remedies are acceptable.  Defs.' Reply 6.  In that
case, the plaintiffs, who were subject to an arbitration
agreement banning punitive damages, brought a civil RICO case
and sought treble damages, as was permitted under the statute.
PacifiCare Health Sys., 538 U.S. at 402-03.  The Supreme Court,
recognizing that treble damages could be considered compensatory
(and thus allowed under the arbitration agreement) or punitive
(and thus forbidden), refused to rule on whether treble damages
under the RICO statute were compensatory or punitive.
Rather, the Supreme Court remanded the case back to the lower
courts to determine whether such damages were "punitive" within
the meaning of the arbitration agreement.  Id. at 406-07.  The
First Circuit, addressing similar Chapter 93A claims, also
remanded a case to the arbiter to make factual findings

necessary to determine whether treble damages and punitive damages were in actual conflict.  See, e.g., Anderson v. Comcast Corp., 500 F.3d 66, 74-75 (1st Cir. 2007).

These cases do not, as the Defendants would argue, stand for the broad proposition that any arbitration agreement limiting damages is proper.  Rather, they stand for the narrower proposition that courts ought try to read arbitration agreements and underlying statutory rules in harmony to the extent possible.  Moreover, turning back to the agreement here, the 2014 Manual provides that the arbiter may not "award indirect, consequential, or special damages of any nature (even if informed of their possibility), lost profits or savings, punitive damages, injury to reputation, or loss of customers or business, except as required by law."  2014 Manual at 45 (emphasis added).  Such language would support a conclusion that broader damages would be allowed if required under the relevant statutory provisions, and thus, like in PacifiCare, this Court ought hold in reserve a finding about whether the arbitration clause and statutory context can be read together in this specific case.  Accordingly, this Court does not rule that the arbitration provision is substantively unconscionable on this ground.

Second, Hopkinton challenges the arbitration agreement's limitation of class action remedies.  See Pl.'s Opp'n 13.  This

argument, however, runs aground in the face of two recent

Supreme Court cases, American Express Co. v. Italian Colors

Rest., 133 S. Ct. 2304 (2013), and AT&T Mobility LLC v.

Concepcion, 131 S. Ct. 1740 (2011). In Concepcion, the Court

held that the Federal Arbitration Act overruled state laws that

sought to mandate class action procedures in consumer

arbitration cases. 131 S. Ct. at 1750-51 ("[C]lass arbitration,

to the extent it is manufactured by [state law] rather than

consensual, is inconsistent with the FAA"). In American

Express, the Supreme Court emphasized that, absent a clear

federal statutory command to the contrary, class action waivers

are valid. 133 S. Ct. at 2309.[5] These cases thus can be read

---

[5] "To a hammer, everything looks like a nail. And to a Court bent
on diminishing the usefulness of Rule 23, everything looks like
a class action, ready to be dismantled." Kagan, J. dissenting in
American Express, 133 S. Ct. at 2320. "On [this] very important
issue… the Roberts Court has been unremittingly conservative:
access to judicial remedies for legal wrongs. At every stage, it
has favored rules that make it more difficult to pursue justice
in the courts…. It has upheld contract provisions that require
consumers and employees to pursue remedies against corporations
through arbitration favored by employers rather than in court.
It has presumptively barred classwide arbitration, even where
that means that some forms of illegal conduct will never be
remedied. This is the case, for example, when a corporation has
fraudulently bilked thousands of consumers out of amounts of
money too small to warrant individual litigation, while its
standard contracts require that all disputes be arbitrated on a
one-by-one basis." David Cole, The Anti-Court Court, New York
Review of Books, Aug 14, 2014. See Andrew Siegel, The Court
against the Courts: Hostility to Litigation as an Organizing
Theme in the Rehnquist Court's Jurisprudence. 84 Tex. L. Rev.
1097 (2006)(demonstrating the disdain shown by the Supreme Court
for the lower courts).

for the proposition that a class action waiver is not so objectionable as to make its existence unconscionable.

Finally, Hopkinton attacks the arbitration clause's limitation of injunction relief only to preliminary injunctions. Pl.'s Opp'n 11. Here, though, given that arbitration clauses may forbid judicial involvement entirely without creating unconscionability problems, it does not seem unreasonable to say that a clause may limit (though not eliminate) such judicial involvement, and Hopkinton points to no case law to the contrary. Cf., e.g., Taylor v. Betts, 59 Ariz. 172, 178 (1942) (recognizing the principle of "the greater includes the lesser").

Accordingly, given the evidentiary record, this Court holds that the 2014 arbitration clause is not substantively unconscionable.

### 4. Determining Questions of Arbitrability

Assuming, as this memorandum has done, that this agreement is subject to arbitration, the question then becomes who – the court or the arbiter – may determine which subjects are within the scope of the arbitration agreement.

The Supreme Court, in A T & T Tech., Inc. v. Commc'ns Workers of Am., 475 U.S. 643 (1986), set out a general rule that "the question of arbitrability . . . is undeniably an issue for judicial determination." Id. at 649. In its next breath,

22

though, it created an exception: "<u>Unless the parties clearly and unmistakably provide otherwise</u>, the question of whether the parties agreed to arbitrate is to be decided by the court, not the arbitrator." <u>Id.</u> (emphasis added). In <u>Awuah</u> v. <u>Coverall North Am., Inc.</u>, 554 F.3d 7 (1st Cir. 2009), the First Circuit unpacked this phrase in a situation where, as here, the arbitration agreement incorporated the Rules of the American Arbitration Association ("AAA"). <u>Id.</u> at 11. There, the court held that the presence of AAA Rule 7(a), which "says plainly that the arbiter may 'rule on his or her own jurisdiction including any objection to the 'existence, scope, or validity of the arbitration agreement,'. . . . is about as 'clear and unmistakable' as language can get." <u>Id.</u> at 11.

In this case, the 2014 Manual dictates that the parties must follow the AAA's Commercial Arbitration Rules and Mediation Procedures, but the operative rule is the same in that context. <u>See</u> <u>Commercial Arbitration Rules and Mediation Procedures</u>, https://www.adr.org/aaa/ShowProperty?nodeId=/UCM/ADRSTG_004103. Such precedent, which has been echoed by other courts, suggests that the arbitrator determines the scope of arbitrability. <u>See also, e.g.</u>, <u>Crawford</u>, 748 F.3d at 262-63 (concluding that a reference to the AAA Rules in the Caremark Provider Agreement was "clear and unmistakable evidence" that the parties "agreed to arbitrate arbitrability").

In response, Hopkinton relies on the Sixth Circuit case
Turi v. Main Street Adoption Servs., LLP, 633 F.3d 496 (6th Cir.
2011). See Pl.'s Opp'n 18. There, faced with a narrow
arbitration clause governing certain fees, the Sixth Circuit
held that despite the incorporation of the AAA Rules which
"generally delegate [the] power [to determine jurisdiction] to
the arbitrator," the arbitrator could not "decide the
arbitrability of . . . claims that are clearly outside the scope
of the arbitration clause." Turi, 633 F.3d at 506-07. The
court held that because the arbitration clause was "narrow," it
was "more likely that the provision [did] not even 'arguably'
apply to the dispute at issue." Id. at 507. Similarly, in
Jackson & Jackson, LLC v. Willie Gary, LLC, 906 A.2d 76 (Del.
2006), also cited by Hopkinton, the Delaware Supreme Court
"adopt[ed] the majority federal view that reference to the AAA
rules evidences a clear and unmistakable intent to submit
arbitrability issues to an arbitrator." Id. at 80. It
interpreted this rule, however, as applying only "in those cases
where the arbitration clause generally provides for arbitration
of all disputes and also incorporates a set of arbitration rules
that empower arbitrators to decide arbitrability." Id. Other
courts have persuasively questioned the reasoning of both of
these decisions. See, e.g., Oracle Am., Inc. v. Myriad Grp.
A.G., 724 F.3d 1069, 1076-77 (9th Cir. 2013).

24

In any event, even if these rules govern here, they do not dictate a different result. Turning first to Turi, there, the Sixth Circuit premised its argument on the assumption that the arbitration clause was so narrow that the provision did not "arguably" apply to the dispute. In this case, the 2014 agreement covers "[a]ny and all disputes between Provider and Caremark," and thus arguably would cover all disputes. 2014 Manual at 50. Turning next to James & Jackson, there, the key question was whether the clause "incorporates a set of arbitration rules that empower arbitrators to decide arbitrability." 906 A.2d at 80. In that case, the court cited as sufficient a decision interpreting an arbitration clause which covered "all matters in dispute between [the parties]." Terminix Int'l Co., LP v. Palmer Ranch Ltd P'ship, 432 F.3d 1327, 1329 n.1 (11th Cir. 2005). Such a clause is essentially the same one as in the case at bar.

Accordingly, this Court rules the arbitrator has the authority to determine the arbitrability of the claims raised in the complaint.

### 5. Judicial Involvement

Finally, the Court addresses the key issue: does this Court have the authority to do anything other than issue a preliminary

injunction?[6]  It does not.  As a starting premise, arbitration

clauses are interpreted pursuant to normal contract

interpretation standards and ambiguities in the scope of the

language are to be resolved in favor of arbitration.  Grand

Wireless, Inc. v. Verizon Wireless, Inc., 748 F.3d 1, 7 (1st

Cir. 2014); see also Paul Revere Variable Annuity Ins. Co. v.

Kirschhofer, 226 F.3d 15, 25 (1st Cir. 2000) (discussing

presumption in favor of arbitrability).

Hopkinton, relying mainly on the 2011 Manual, argues that

the arbitration clause specifically reserves for parties the

right to seek injunctive relief in state or federal court.

Pl.'s Opp'n 15.  It does.  But that is of no moment: as

discussed earlier, the 2014 Manual, not the 2011 Manual,

controls.  Turning to the clause in the 2014 Manual, the clause

reserves the right of either party to "seek[] preliminary

---

[6] It may seem incongruous for this Court to consider this
question, having just ruled that the arbiter has the right to
determine arbitrability.  Such apparent conflict can be
resolved, however, by recognizing that the above arbitrability
analysis concerns which aspects of the substantive relationship
between the parties are to be determined by the arbiter, while
this question discusses what, if any, procedural role the Court
plays in overseeing the arbitration process.  The FAA itself
provides an analogy – there, the Court maintains a procedural
role in compelling arbitration, even though it may have no
substantive power to resolve disputes.  See 9 U.S.C. § 4.  Here,
by analogy, the arbitration agreement reserves a preliminary
injunction role to the Court, even though it strips it of its
power to resolve any contested substantive issues.
    Alternatively, this clause in the arbitration agreement may
be conceived of as a clear (if very specific) exception to the
broad grant of power to the arbiter to determine arbitrability.

injunctive relief to halt or prevent a breach of this Provider

Agreement in any state or federal court of law."  2014 Manual at

46.  In the same breath, though, the clause provides (in bolded

language) that:

> In arbitration, Provider and Caremark will not have
> the rights that are provided in court, including the
> right to a trial by judge or jury.  In addition, the
> right to discovery and the right to appeal are limited
> or eliminated by arbitration.  All of these rights are
> waived and disputes must be resolved through
> arbitration.

Id. at 45.

Under governing Arizona law, "each part of a contract must

be read together, 'to bring harmony, if possible, between all

parts of the writing.'"  ELM Ret. Ctr., LP v. Callaway, 226

Ariz. 287, 291 (Ariz. Ct. App. 2010) (quoting Gesina v. Gen.

Elec. Co., 162 Ariz. 39, 45 (Ariz. Ct. App. 1988)).  Reading

these two provisions together, then, the best reading is that a

party can seek judicial action to pause the breach of the

Agreement, but cannot seek the courts involvement substantively

to resolve the dispute, otherwise the provision that states that

neither party has "the right to litigate that dispute through a

court" would be rendered meaningless.  Given that courts

generally "lack[] authority to act in the face of a valid

arbitration agreement," DiMercurio v. Sphere Drake Ins., PLC,

202 F.3d 71, 78 (1st Cir. 2000), the language in the Provider

Agreement implies that this Court may: (1) issue a preliminary

injunction, and accordingly take evidence and hold proceedings

necessary to determine whether to so issue, but (2) may not

combine an injunction proceeding with a trial on the merits, and

may not issue a final ruling on the merits.  This the Court

proceeded to do.[7]

## B. Determining the Preliminary Injunction

On July 18, 2014, the Court granted Hopkinton a preliminary

injunction ore tenus, fully explaining its reasoning from the

bench. The key findings and rulings were set forth as follows:

> The Court, now having held a two-day evidentiary
> hearing, makes the following ultimate findings on the
> motion of Hopkinton Drug, Incorporated for a
> preliminary injunction.
> The Court finds that Hopkinton Drug has
> demonstrated that, in the absence of preliminary
> relief, it is and will in the future continue to suffer
> irreparable harm as the legal framework construes it.
> The loss of its pharmaceutical customers is in large
> measure, this Court infers, irreparable. The fact that
> that loss may largely be quantified does not entirely

---

[7] There was some question at the time of the hearing whether
claims for preliminary injunctive relief might still lie, or
whether, if the contract has already been voided, they are moot.
See Davidson v. Howe, 749 F.3d 21, 25-26 (1st Cir. 2014) (appeal
of denial of preliminary injunction is moot if event to be
enjoined has occurred); Bader v. Goldman Sachs Grp., Inc., 311
F. App'x 431, 432 (2d Cir. 2009) (same); Chapman v. S. Buffalo
Ry. Co., 43 F. Supp. 2d. 312, 318 (W.D.N.Y. 1999) ("An issue is
mooted [and thus a preliminary injunction cannot issue] where
the activities the plaintiff seeks to enjoin have already
occurred . . . ."); see also Black's Law Dictionary 904 (10th
ed. 2014) (defining preliminary injunction as "[a] temporary
injunction issued before or during trial to prevent an
irreparable injury from occurring before the court has a chance
to hear the case").  The Court concludes that whether or not the
contract has been breached (a question for the arbiter),
maintenance of the previous status quo remains within the
equitable jurisdiction of this Court.

satisfy the damage to Hopkinton's goodwill because there are collateral benefits to any drugstore from its customer base, a customer base that this Court finds is presently being removed at least in the range of one-quarter to one-third.

The balance -- putting aside the reasonable likelihood of success, the balance of harm also favors Hopkinton because Caremark is in the business of managing these pharmaceutical benefits and has the capacity both to accept such a pharmacy and to terminate such a pharmacy, whereas with Hopkinton it's a one-way street, unless it is a member of the Caremark network it can't -- it has no other means of obtaining access to the needs of customers located within its geographic base who have health care plans that have contracted with Caremark.

Third, the Court readily infers that the public interest favors a viable drugstore in downtown Hopkinton that is served by the largest number of pharmacy benefit managers and in turn is served or is connected with the largest number of insured employer and employee insured benefit plans. The public is the people, not these litigating corporations. The people are best served by a full-service pharmacy in that location that can handle the prescriptions of the largest number of people in that geographic area.

The Court concludes that there is no significant safety issue identified in this proceeding. The issue on which prior arbitration proceedings have turned has to do with the matter of licensure, it does not have to do with the matter of safety. And therefore there would seem to be no damage to the public health and safety from a reinstatement of Hopkinton.

Now, turning to what is the dispositive issue, the reasonable likelihood of success on the merits. Here it is clear that the significant aspects of this present termination dispute have already been determined by a prior arbitration between the parties. The Court notes, parenthetically, having read the two decisions of the arbitrator, that they are models of the judicial art, they are straightforward, they are succinct, they dispose of the matters directly before the arbitrator in a clear and persuasive manner, and the Court has little hesitancy in -- on this record anyway, fully subscribing to them and giving them res judicata effect. And so the following things have been decided and are not – and will not be revisited.      Hopkinton broke this contract by dispensing drugs in states where it was not licensed. On this record this court does not conclude that that was intentional in any way, but it is a violation of the terms of the agreement and it is an undoubted violation. Caremark properly and in accordance with its contract then sequestered funds from Hopkinton. The result was that once they found out

about it -- once it found out about it, Hopkinton
sought arbitration. Arbitration then ensued. The result
of the arbitration was a finding of breach by
Hopkinton, but a finding of breach in the amount of the
sequestration on the part of Caremark.

The document speaks for itself. I won't
characterize it. The amount of over sequestration was
modest, but not de minimis, and that sum was awarded to
Hopkinton. And then, in accordance with the rules of
the American Arbitration Association, Hopkinton, as the
prevailing party on that issue, was awarded its
attorneys fees and costs and the sum total amounts to
about $100,000.

Against this record in this proceeding on the
reasonable likelihood of success, Hopkinton advances
two arguments. It says that the matter of termination,
which could have but was not raised in the arbitration
proceeding, has in effect been concluded by the
arbitration proceeding and Caremark cannot now
terminate it on the ground of the proper, at least to
some extent, sequestration that was adjudicated in the
arbitration proceeding because the arbitration
proceeding took care of all issues having to do with
that audit.

In order for that argument to have any merit,
this Court must import to the arbitration proceeding by
analogy the -- what are the compulsory counterclaim
requirements of most court rules of civil procedure.
The Court does so on the basis of the brief filed by
Hopkinton.

The Court -- there is a need here for immediate
action and based upon the case law, which has been
presented to the Court, I conclude that, by analogy,
the rules of res judicata apply here as to claims which
could have been but were not brought in the
arbitration, which claims are so significantly related
to the dispute at hand that any reasonable person would
have understood that they could have been brought, and
have allowed the arbitrator to resolve them. That's the
major ground of decision. And if these cases don't say
what Hopkinton claims they say, it is fully open to the
Court to reconsider it.

A secondary ground of decision is that the Court
finds a reasonable likelihood of success on the issue
of a violation of the covenant of good faith and fair
dealing. There is a variety of grounds that the Court
reaches this conclusion, but it is based upon the
totality of the record. The passage of time from the
events uncovered in the audit, the Court finds that
those problems were corrected by Hopkinton with
reasonable promptitude. The language of the
termination, which depends upon those events, though
the termination is sometime long after, they were
corrected. The immediacy of the $100,000 award to

Hopkinton, not yet paid by Caremark, and the concern
that the Court has, and I think it is a reasonable and
fair inference, that these contractual agreements may
be -- and there is evidence in the record that they
are, being used to exercise economic power rather than
just the rights under the contract.

For all these reasons the Court preliminarily and
mandatorily orders CVS Caremark Corporation, its
agents, officers, subsidiaries, its parent, all persons
acting -- its attorneys, all persons acting in concert
with them, that they as -- immediately, one, revoke the
notice of termination dated June 23rd, 2014, that they
immediately reinstate Hopkinton Drug, Incorporated as a
provider with the full rights and benefits under the
provider agreement appertaining thereto. And this order
of the Court will remain in effect until further order
of the Court, either upon reconsideration or upon the
arbitration award seeking to be confirmed by either
party which may well indicate that the preliminary and
mandatory injunction just entered is improvident.

This award -- this preliminary injunction requires
a bond. A sufficient bond is the $100,000 payment under
the arbitration award. Caremark need not pay over those
sums until the Court -- until it is decided either by -
-
until it -- were it decided by a higher court that this
injunction was improvidently granted and then that
$100,000 will suffice to recompense, upon adequate
proof, Caremark for any damages it may suffer by virtue
of the award.[8]

---

[8] One deeply troubling aspect of these proceedings is the
testimony of Heidi Haffner, Senior Manager of Pharmacy Audit for
CVS Caremark, a long-time attendee of meetings held by the
Pharmacy Membership Review Committee, the body within CVS
Caremark that evaluates alleged violations of the Provider
Agreement.  Ms. Haffner testified that, while this committee has
at least a decade of experience evaluating such violations, no
CVS pharmacy has ever been terminated, while a number of
independent pharmacies have suffered the ultimate sanction of
termination. July 17, 2014 Transcript 142: 5-19, 148: 15-23, ECF
No. 43.

This Court expresses no opinion on the internal
relationship of CVS pharmacies to the CVS Caremark pharmacy
benefits manager function. There is here, however, at least the
appearance of impropriety from the apparent disparity in
treatment as between independent pharmacies and CVS Caremark's
own brood. Accordingly, the Court will forward a certified copy
of the transcript and opinion in this case to the Federal Trade
Commission and the Antitrust Division of Department of Justice

## C. What Now?

As presaged by the analysis above, once this Court had disposed of the issues relating to the preliminary injunction, it dutifully sent the parties to a second arbitration and administratively closed the court case. In retrospect, perhaps the Court was over-hasty, causing the parties needless expense and delay.[9] See Telephone Workers U. of N.J., Local 827 v. New Jersey Bell Tel. Co., 584 F.2d 31, 33 (3d Cir. 1978) (district court should determine whether prior federal judgment decided issue on which party seeks to compel arbitration); Sprague & Rhodes Commodity Corp. v. Instituto Mexcicano Del Café, 566 F.2d 861, 863 (2d Cir. 1977) (district court should determine res judicata effect of foreign judgment on petition to compel arbitration); National Shipping & Trading Corp. v. Buck Shipping Int'l Ltd., No. 81 Civ. 3818 (S.D.N.Y. Apr. 3, 1985) (LEXIS, Genfed Library, Dist file) [available on WESTLAW, 1985 WL 495] (courts appropriately consider res judicata arguments on motions to compel or stay arbitration).

---

for such investigation and action as either or both may deem appropriate.

[9] It may be objected that this conclusion comes far too late. True, but as Justice Frankfurter correctly observed: "Wisdom too often never comes, and so one ought not to reject it merely because it comes late." Henslee v. Union Planters Nat. Bank & Trust Co., 335 U.S. 595, 600 (1949) (Frankfurter, J. dissenting).

In this case, the facts are not in dispute, and the law is clear.  Indeed, there seems little for the arbiter to do because "[t]he doctrine of res judicata bars relitigation of a claim that has been adjudicated in a prior action involving the same parties or their privies." Chestnut Hill Dev. Corp. v. Otis Elevator Co., 739 F. Supp. 692, 696 (D. Mass. 1990) (Caffrey, J.) (citing Commissioner v. Sunnen, 333 U.S. 591, 597 (1948)). In fact, it is black letter law that a valid and final judgment in favor of a defendant bars a subsequent action by the plaintiff regarding the same claim.  Where a valid and final judgment in any action "extinguishes the plaintiff's claim pursuant to the rules of merger or bar, the claim extinguished includes all rights of the plaintiff to remedies against the defendant with respect to all or any part of the transaction, or series of connected transactions, out of which the action arose."  Restatement (Second) of Judgments § 24(1).

Res judicata applies with equal force to arbitration: "[A] valid and final award by arbitration has the same effects under the rules of res judicata, subject to the same exceptions and qualifications, as a judgment of a court."  Restatement (Second) of Judgments § 84(1) (1982); see also In re Dunn, No. 06-10630, 2007 WL 8027259, at *6 (D. Mass. Feb. 27, 2007) (Saris, J.) ("[T]he First Circuit has left no doubt that an arbitrator's decision may be given preclusive effect.  The First Circuit has

held the doctrines of collateral estoppel and res judicata apply to arbitration awards.") (internal citations and quotations omitted).[10]

The oft-cited decision in <u>Burmah Oil Tankers, Ltd.</u> v. <u>Trisun Tankers, Ltd.</u>, 687 F. Supp. 897 (S.D.N.Y. 1988) (MacMahon, J.) is squarely on point.

> It is well settled that the related doctrines of res judicata and collateral estoppel apply to arbitration proceedings. <u>Maidman</u> v. <u>O'Brien</u>, 473 F. Supp. 25, 29 (S.D.N.Y. 1979). Res judicata bars all claims that were or could have been raised by a party to prior litigation on the same cause of action. <u>Brown</u> v. <u>Felsen</u>, 442 U.S. 127, 131, 99 S. Ct. 2205, 2209, 60 L. Ed. 2d 767 (1979); <u>Zoriano Sanchez</u> v. <u>Caribbean Carriers, Ltd.</u> 552 F. 2d 70, 72 (2d Cir.), cert. denied, 434 U.S. 853, 98 S.Ct. 168, 54 L. Ed. 2d 123 (1977); <u>Dalow Industries, Inc.</u> v. <u>Jordache Enterprises</u>, 631 F. Supp. 774, 778 (S.D.N.Y. 1985). Res judicata thereby prevents splitting a cause of action, <u>see Migra</u> v. <u>Warren City School Dist. Bd. Of Educ.</u>, 465 U.S. 75, 77 n. 1, 104 S. Ct. 892, 894 n. 1 79 L. Ed.2d 56(1984); <u>Schattner</u> v. <u>Girard, Inc.</u>, 668 F.2d 1366, 1368 (D.C. Cir.1981), and the attendant waste of judicial resources, increased burdens on litigants, and undermining of finality of judgments that follow from splitting a cause of action. <u>See Schmieder</u> v. <u>Hall</u>, 545 F. 2d 768, 771 (2d Cir. 1976), cert. denied, 430 U.S. 955, 97 S. Ct. 1601, 51 L. Ed. 2d 805 (1977); <u>Ritchie</u> v. <u>Landau</u>, 475 F. 2d 151, 156 n. 5 (2d Cir. 1973). These concerns particularly apply to arbitration which is intended to promote speedy, efficient, and inexpensive resolution of disputes. <u>See Schattner</u> v. <u>Girard, Inc.</u>, supra, 668 F. 2d at 371; Note, The Preclusive Effect of Arbitral Determinations in Subsequent Federal Securities Litigation, 55 Fordham L. Rev. 655, 664 (1987) ("By preventing unnecessary duplicative litigation and promoting speedy yet efficient claim resolution, the doctrine of preclusion is in harmony with the Arbitration

---

[10] An arbitration award, however, "does not preclude relitigation of the same or a related claim based on the same transaction if a scheme of remedies permits the assertion of the second claim notwithstanding the award regarding the first claim." Restatement (Second) of Judgments ¶ 84(2). A close perusal of the Provider Agreements here suggests no such exception.

Act's goal of promoting efficient dispute resolution."
(footnotes omitted)); cf. Liberian Vertex Transports, Inc.
v. Associated Bulk Carries, Ltd., 738 F. 2d 85, 87 (2d Cir.
1984) (declining to permit interim appeal of district court
refusal to confirm partial final award: "such a right would
undermine the major purpose of the Federal Arbitration Act,
which is 'to permit a relatively quick and inexpensive
resolution of contractual disputes by avoiding the expense
and delay of extended court proceedings.'" (quoting in part
Diapulse Corp. V. Carba, Ltd. 626 F. 2d 1108, 1110(2d Cir.
1980)).

    The parties do not dispute that the arbitration award
was a final decision on the merits and that they were both
parties to it. The parties also do not dispute that
Trisun's demurrage claim could have been presented to the
arbitration panel but was not.

Id. at 899.

Applying Judge MacMahon's analysis to this case is

particularly compelling: "Clearly, the facts [here] are 'related

in time, space, origin, or motivation,' because they arise out

of the same document [the Provider Agreement] and same

transaction [the breach for non licensure] previously examined

at length by the arbitrator[]. In contract disputes involving

two claims under the same contract, the parties would be

required to litigate both claims in the same cause of action."

Id. at 900.  See also Alyeska Pipeline Serv. Co. v. United

States, 688 F. 2d 765, 769 (Ct. Cl. 1982) (single nondivisible

contract normally gives rise to only one claim), cert. denied,

461 U.S. 943 (1983); Frankel v. Standard Radio Corp., 270 N.Y.S.

2d 667, 669 (N.Y. Civ. Ct. 1966) (separate claims under same

contract "must be referred to arbitration as one for complete

relief in an arbitration award"); see also Solow v. Avon Prods.,
Inc., 56 A.D. 2d 785, 786 (N.Y. App. Div. 1977) ("Claims for
damages spawned by the same liability on the same contract, and
ascertainable at the time an action is commenced, must be
demanded, if at all, in that action."); 4 A. Corbin, Corbin on
Contracts 955, at 837 (1951) ("[I]t is inconvenient and
vexatious to bring more than one action after all the breaches
have occurred."). CVS Caremark offers no reason for a different
result here. Indeed, the next arbiter will be considering the
very same evidence as his predecessor. Accordingly, CVS
Caremark's demand for termination should have been raised in the
original arbitration proceeding and ought not now be raised
separately. Burmah Oil Tankers, 687 F. Supp. at 901.

    Despite this determination, however, "there is broad
agreement among the circuit courts that the 'effect of an
arbitration award on future awards . . . is properly resolved
through arbitration." Employers Ins. Co. of Wausau v. OneBeacon
Am. Ins. Co., 744 F.3d 25, 27 (1st Cir. 2014) (quoting Courier-
Citizen Co. v. Bos. Electrotypers Union No. 11, 702 F.2d 273,
280 (1st Cir. 1983)). Furthermore, the First Circuit has
determined that the arbiter is the proper person to determine
the preclusive effect of a prior arbitration. Id. at 28 (citing
National Cas. Co. v. OneBeacon Am. Ins. Co., No. 12-CV-11874,

2013 WL 335022, at *8 (D. Mass. July 1, 2013) (Casper, J.)).

Thus, this Court, at present, will stay its hand.

**III. CONCLUSION**

      For the foregoing reasons, the Court preliminarily enjoined CVS Caremark from terminating Hopkinton as a party to the Provider Agreement, and ordered the parties to arbitrate the merits of the dispute.

                           /s/ William G. Young
                           WILLIAM G. YOUNG
                           DISTRICT JUDGE